# UNITED STATES DISTRICT COURT

# DISTRICT OF MAINE

|  |  |
|---|---|
| WILLIAM R. GRACE,<br><br>    Plaintiff<br><br>v.<br><br>JEAN A. YARNALL,<br><br>     Defendant | Civil No. 04-173-B-C |

Gene Carter, Senior District Judge

## MEMORANDUM OF DECISION AND ORDER

This case involves a dispute concerning the rights and responsibilities stemming from an easement for use of a wharf. Plaintiff seeks a declaratory judgment that the easement at issue has been extinguished and injunctive relief barring continued use by Defendant. In addition, Plaintiff seeks an award of damages for Defendant's failure to contribute for costs incurred maintaining the wharf. After a bench trial was conducted on April 24 and 25, 2006, the parties submitted post-trial briefs on all issues. The Court now renders its findings of fact and conclusions of law.

## I. FINDINGS OF FACT

The properties at issue are adjacent ocean-front parcels located in Northeast Harbor, Maine on Somes Sound. Prior to 1982 both properties were owned by Charlton Yarnall (hereinafter "Mr. Yarnall"), the now deceased husband of Defendant Jean Yarnall. In 1982 Mr. Yarnall conveyed one of the parcels to Plaintiff William R. Grace.

Mr. Yarnall retained the parcel containing the main residence, known as "the Barnacles."

Included in the conveyance to Plaintiff was a structure, extending into the ocean, consisting of an approximately 200 foot pier, a ramp, and a float.  This structure, which the Court will collectively refer to as "the wharf," was located on the property conveyed to Plaintiff, and was explicitly included in the conveyance.  Deed from Charlton Yarnall to William Grace, Exhibit 2 at 1.  The deed, however, reserved an easement appurtenant in the wharf, benefiting the property retained by Mr. Yarnall.  *Id*. at 2-3.  The deed described the easement as follows:

> The right, privilege, and easement of using the aforesaid pier and float,
> said right, privilege and easement to be used in common by the Grantor,
> by the Grantee and their respective heirs and assigns and by others having
> similar rights therein.

*Id*. at 3.  The deed also contained a provision regarding the maintenance of the wharf, stating, "If the aforesaid pier and float are used by the Grantor, the Grantor will pay his proportionate share of the cost of maintenance of said pier and float."  *Id*.  The deed does not further describe what is meant by the term "proportionate share," and there is no evidence that the parties specifically discussed its meaning at the time of the reservation. The clause reserving the easement was included in the deed at Mr. Yarnall's request.

Defendant became joint owner of the property on September 27, 1982, when Mr. Yarnall conveyed, by quitclaim deed, the Barnacles to his wife and himself as joint tenants.  Stipulations ¶ 5, Joint exhibit A.  On January 8, 1989, Mr. and Mrs. Yarnall (hereinafter "the Yarnalls") sold the Barnacles.  *Id*. ¶ 6.  The Yarnalls, however, regained joint ownership on January 3, 1991, after foreclosing on the property.  *Id*.  Plaintiff does not contend that the Yarnalls regained any less of a property interest than they had sold in 1989.  Defendant became the sole owner of the Barnacles on October 9, 2000, upon the

2

death of her husband.  *Id.* ¶ 7.

In the period from 1982 until 2004 both families made use of the wharf.  Plaintiff and his family used their property as a summer residence.  Plaintiff's wife, Marjorie, customarily arrived around July 1st and departed on Labor Day.[1]  Marjorie was normally joined by her husband on weekends in July and the entire month of August.  Plaintiff's children also spent most of the summers at the residence, with their use declining as they got older.[2]  The Graces used the wharf for an assortment of activities, including docking boats, swimming, fishing, and stargazing.[3]

Like the Graces, the Yarnall family used their property as a summer residence.  Defendant would customarily spend the entire month of July at the residence, with occasional trips there in June and September.  The Yarnalls normally rented the property out for the month of August.  While residing at the Barnacles, the Yarnalls and their guests made occasional use of the wharf.  Part of this use was by the Yarnall's children and grandchildren.[4]  Additionally, the Yarnall's permitted their guests to use the wharf,

---

[1] In the summer of 2000 she did not arrive until late July following Plaintiff's daughter's wedding.

[2] Plaintiff's son, William Grace Jr., accompanied Marjorie during her entire stay from 1983 through the summer of 1986 and again in the summer of 1988.  In 1987 and 1989, William Jr. visited the property during the last week of August through Labor Day.  With the exception of the summers of 1995 and 1996, in which he did not visit the property at all, William Jr. has since customarily visited for two weekends in July and two weeks in August.  The Graces' son, Joseph, also visited the property throughout his mother's stay from 1983 through 1985.  From 1986 through 1991 he typically visited the property for one month during the summer.  Since 1992, he spent between 2.5 and 3 weeks each summer at the property.  Marjorie Lehrman, the Graces' oldest daughter, accompanied her mother to the property for her entire stay through 1998.  Since 1999 she has typically visited the property for the entire month of August.  The Graces' youngest child, Amy Grace, accompanied her mother from 1983 through 1999.  The Graces' other son was unable to appear at trial, and there is no evidence as to his use of the property.

[3] The Grace children each testified to their approximate average use of the dock as follows: William Jr., 3 hours per day when he was younger and 1-2 hours per day as he grew older; Joseph, 2-3 hours per day; Marjorie, 1-6 hours per day; Mara, 1-5 or 6 hours per day.

[4] From 1983 through 1986 Charlton Yarnall Jr., the Yarnall's oldest son, used the property with his wife for approximately one week in June.  Beginning in 1989 they regularly stayed at a nearby property and, on occasion, used the wharf from between ½ to 2 hours.  In July of 2000 Charlton Jr. spent a week at the

both when visiting and renting the property.[5]

While both families made use of the wharf, only the Graces ever contributed to its maintenance.  The wharf required that each year the float and ramp be removed and stored for the winter to safeguard it against winter storms.  Plaintiff paid for the service of removing, storing, and reinstalling the dock each year.  For the years 1982 through 1991, Plaintiff paid $500 per year for this service.  Deposition of Dan Chalmers, Exhibit 28 at 6.  For the years 1992 through 1997, he paid $700 per year for this service.  *Id*.  From 1998 through 2004 Plaintiff paid a total of $10,871.71 for these services, plus the cost of other maintenance on the wharf.  *See* Plaintiff's Exhibit 25.[6]

In addition to this maintenance work, performed by professionals, Plaintiff and one of his sons also personally performed regular maintenance work on the wharf.  They

---

Barnacles and rented a boat, using the wharf for approximately a half an hour per day.  He again visited the Barnacles in 2004 to assist his mother in moving.  One of the Yarnall's daughters, Mary Elise, visited the Barnacles for two weeks in September from 1998 through 2004, and also stayed there five days in July of 2004.  She would use the wharf by walking with her dogs on it.  She also visited in June of 2001 and spent some time fishing off of the wharf.  The Yarnall's other son, Alex, visited the Barnacles (sometime in the 80's, probably in July) and borrowed a boat from a cousin for the day and tied it to the wharf.  Between 1995 and 2004 Alex visited the Barnacles seven times, sometimes bringing his wife and children.  These stays would last between a week and two, and occur mostly in July, once or twice September.  He and his family would use the wharf two to three times on these visits.  They would walk on the dock, sunbathe, swim, and do some fishing, spending approximately one hour on the wharf.  Defendant's granddaughter, Samantha stayed at the Barnacles every summer until 2004.  She spent approximately three weeks, usually in July or August at the residence each year.  She would use the wharf approximately twice a week to dock boats, swim, fish, and also to sit.  Samantha would have friends come over and tie their boats to the wharf, and use it for swimming and hanging out.

[5] Carol Littleton and her husband, longtime friends of the Yarnalls, visited them at the Barnacles at least 6 times between 1983 and 1997.  Each time they came by boat they would anchor the boat and take a dinghy to the shore, tying the dinghy to the wharf, sometimes leaving it there for several hours.  Mr. Yarnall's friend Louis Gerald Tarantino, used the Barnacles for a couple of weeks each September for the 11 or 12 years preceding 2004.  Mr. Yarnall told him that he could use the wharf, and he did so 2-4 times each visit to watch the sunset, have cocktails, or simply "show it off."  He generally spent 15-45 minutes on the wharf.  The Yarnalls also rented the property for the month of August, sometime around the early 90's, to Henry Mellon.  Mr. Mellon used the wharf for several hours over the month, including to sunbathe and pick-up and drop-off people from his boat.

[6] At trial, Defendant objected to the admission of exhibit 25 on the basis of foundation, and the Court took the issue under advisement.  The Court has since reviewed the Deposition testimony of Dan Chalmers, *see* exhibit 28, and now finds that an adequate foundation has been laid for the document's admission.  Accordingly, Defendant's objection is overruled, and exhibit 25 is admitted.

replaced rotting boards on the pier, fastened fencing along the rails, and repaired a walkway that connected the pier to the shore.  Plaintiff did not keep records of the time spent doing this work, or the materials purchased to complete it.  Nevertheless, Plaintiff estimates that between 1983 and 1994 he spent approximately 20 hours each summer doing this work, and that his son Joseph spent approximately 15 hours doing so.  Plaintiff estimates that the value of the labor was approximately 12 or 13 dollars per hour.  Plaintiff further estimates that he spent approximately $120 to $140 each summer in supplies for this maintenance work.

Despite Plaintiff's work in maintaining the wharf, by 1995 it was in need of substantial structural repair.  Plaintiff sought several bids for performing the work, and also retained an architect to assist him in reviewing the bids.  In addition to reviewing the bids, the architect also made suggestions of how the wharf could be improved, including designing and sketching a proposed "pavilion" to be added to the dock.  Deposition of Robert Burley, Exhibit 29 at 6.  Ultimately, Plaintiff chose not to include the pavilion in the refurbished wharf, and the wharf was reconstructed in substantially the same condition as it previously existed.  Plaintiff did follow the architect's recommendation regarding which contractor to employ, and various recommendations regarding the type of materials and related matters.  The only evidence establishing the architect's fee for these services, is Plaintiff's testimony that he paid him $4,400 for his work.  For reconstruction of the wharf, Plaintiff paid $25,566.  This work included construction of a new float, ramp, and much of the pier.  The original granite cribs that supported the pier were left in place and incorporated into the refurbished structure.

Plaintiff did make some effort to receive contribution for the funds which he

expended on keeping the wharf in good repair.  In the summer of 1983, Plaintiff approached Mr. Yarnall and asked him to contribute to the cost of maintaining the wharf. Mr. Yarnall refused, indicating that he did not intend to use it, and thus, was not going to pay for its maintenance.  Based, at least in part, upon Mr. Yarnall's statements, Plaintiff did not again seek any contribution from the Yarnalls for the cost of maintaining the wharf until 1995, when he sought contribution for reconstruction of the wharf.  On March 26, 1995, Plaintiff faxed the Yarnalls information concerning proposals to perform the wharf construction.   He followed this with a letter, dated April 2, 1995, in which he informs the Yarnalls that if they wish to use the wharf "then your share of the amortized cost will be provided to you."  Exhibit 6.  Defendant responded by letter dated April 26, 1995, in which she stated that she and her husband were "interested in doing [their] part to maintaining [sic] the dock/pier."  Exhibit 7.  Subsequently, Plaintiff informed at least one of the Yarnalls that he wanted them to contribute half of the cost of refurbishing the wharf.  The Yarnalls refused to do so.  Mr. Yarnall informed Plaintiff that he would not pay half because he never used the wharf.

In 2001 Defendant placed the Barnacles for sale.  Despite the language in the deed reserving an easement for use of the wharf, Defendant did not include the right to do so in listing the property.  This omission was motivated, at least in part, by Defendant's concern that the Graces may dispute the status of the easement.  In 2003, Defendant sent the Graces a Christmas card, in which she included a note stating that "I would like to start contributing my portion of the annual maintenance of the dock."  Exhibit 9. Plaintiff, assuming that the card was an attempt to settle Defendant's concern about the easement, did not respond.

In 2004 Defendant agreed to sell the Barnacles to Plaintiff's sister, Teresa Grace Sears.  Prior to closing, however, Plaintiff brought the instant suit, claiming that the easement to use the wharf no longer existed.[7]  As a result of this action, Defendant and Ms. Sears entered into an escrow agreement, withholding $250,000 of the purchase price pending the outcome of this suit.  If Plaintiff succeeds on his claim that the easement ceased to exist, then Ms. Sears receives the escrow funds.  If Plaintiff's claim fails, Defendant receives the escrow funds.  Additionally, Plaintiff and Ms. Sears have entered into an agreement whereby, if the easement is found to continue to exist, thus entitling Defendant to the escrow funds, Plaintiff will pay Ms. Sears $250,000 in return for extinguishment of the easement.

## II.        CONCLUSIONS OF LAW

### A.  Extinguishment of the Easement

Plaintiff asserts two separate theories in support of his claim that the easement has been extinguished: abandonment and extinguishment by destruction.

### 1.  Abandonment

In order to succeed on his claim for abandonment, Plaintiff must prove "a history of nonuse coupled with an act or omission evincing a clear intent to abandon."  *D'Angelo v. McNutt*, 2005 ME 31, ¶ 13, 868 A.2d 239, 244.  Although the Court has found that Defendant did make use of the wharf between 1982 and 2004, Plaintiff argues that the type of usage evidenced by the record is insufficient to defeat his claim for abandonment.  Specifically, he argues that the Yarnalls attempted to use the wharf in a manner and at

---

[7] Although this sale has since been completed and Defendant is no longer owner of the property, "he who takes a conveyance of land in litigation takes it subject to such judgment as may eventually be rendered in that case."  *Holman v. Lewis*, 76107 Me. 28, 31 (1910) (quoting *Berry v. Whitaker*, 58 Me. 422, 423 (1870)).  Consequently, Plaintiff's claim against this Defendant is not moot.

times so as to prevent the Graces from discovering their use.  Additionally, he asserts that

Defendant's failure to contribute to maintenance of the wharf renders her use outside the

scope of the easement, and, thus, irrelevant for purposes of the abandonment analysis.

Plaintiff's argument here fails because the scope of the easement is governed by

its purpose.  *See Ware v. Public Services Co. of N.H.*, 412 A.2d 84, 86 (Me. 1980) ("If

the deed specifies the particular *purpose* for which the easement or right of way is

granted, then the grantee cannot use it for other *purposes*.") (emphasis added).  Plaintiff

does not assert that the wharf was ever used for improper purposes.  In fact, the types of

uses which the Yarnalls made of it are similar to those that the Graces made, such as

swimming, sunbathing, and tying up boats.  Plaintiff cites to no authority for the

proposition that an easement holder's failure to make required contributions for

maintenance, renders any use a misuse.  Nor does Plaintiff provide any authority

supporting his argument that misuse is the same as nonuse.

Moreover, even if the Court were to find that Plaintiff had met his burden to prove

nonuse, Plaintiff's claim must still fail because he has failed to prove the requisite intent

to abandon.  In order to establish intent to abandon Plaintiff must show "unequivocal acts

inconsistent with the further assertion of rights associated with the existence of the

easement…The acts asserted as evidence of abandonment must be decisive and

conclusive and thereby indicate a clear intent to abandon the easement." *Rutland v.*

*Mullen*, 2002 ME 98, ¶ 9, 798 A.2d 1104, 1109 (quoting *Phillips v. Gregg*, 628 A.2d 151,

152 (Me. 1993)).  Plaintiff asserts five acts or omissions to meet this burden: (1) the

Yarnalls' failure to seek agreement on the location of a footpath from their property to

the wharf, (2) Mr. Yarnall's statements to Dr. Grace about nonuse, (3) the Yarnalls'

refusal or failure to contribute towards maintenance, (4) the deliberate omission of any reference to wharf rights for the sale of the "Barnacles", and (5) an alleged attempt by Defendant's broker to purchase those rights from Dr. Grace.  The Court will address each of these in turn.

Although the Yarnalls never sought an agreement on the precise location of the footpath referenced in the deed, there was, in fact, an identifiable path that existed from the Barnacles to the wharf.  More importantly, the lack of an agreement as to the location of the footpath did not prevent them from using the wharf.  Consequently, their failure to seek such an agreement was not "inconsistent with the further association of rights associated with the existence of the easement." *Id*.

Similarly, Mr. Yarnall's statements concerning nonuse do not evidence a "clear intent to abandon the easement." *Id*.  The reservation creating the easement provides that the dominant estate would be liable for contributing towards maintenance *if* the wharf was used.  The deed, therefore, contemplates the existence of the right to use the wharf, even where the easement is not actually used for a period of time.  Accordingly, Mr. Yarnall's statements concerning nonuse are not "inconsistent with further assertion of rights associated with the existence of the easement." *Id*.

Moreover, even if Mr. Yarnall's statements were evidence of *his* intent to abandon the easement, they do not provide any evidence of *Mrs. Yarnall's* intent to abandon it.  Defendant was joint owner of the property at the time these statements were made.  There is no evidence that Defendant had any knowledge of these statements, acquiesced in their utterance, or otherwise agreed with their content.  Consequently, any statements made by Mr. Yarnall do not demonstrate any intent to abandon the easement

on the part of Mrs. Yarnall, the Defendant.

The Yarnalls' refusal and/or failure to contribute towards maintenance also do not demonstrate intent to abandon the easement.  As noted above, the obligation to contribute for maintenance only arose upon use of the wharf.  Thus, the obligation arises from assertion of the right.  It would defy logic to conclude that by exercising the right without fulfilling the obligation, they demonstrated an unequivocal intent to abandon the very right that they were, in fact, exercising.  Accordingly, this conduct is not evidence of intent to abandon.

Lastly, the evidence relating to Defendant's advertisement and resulting sale of the Barnacles to Ms. Sears does not demonstrate intent to abandon.  At best, the evidence supports the conclusion that Defendant had concern that she might not still have rights to use the wharf.  This in no way, however, suggests that she intended to abandon the easement.  Accordingly, the Court concludes that Plaintiff has failed to meet his burden of proof on the claim of abandonment.

### 2.  Extinguishment by Physical Destruction

Alternatively, Plaintiff argues that the easement was extinguished by the physical destruction of the wharf.  Plaintiff relies on *Inhabs. of Town of Sabattus v. Bilodeau*, 391 A.2d 357, 360 (Me. 1978), in which the Law Court stated the general rule that "an easement in a structure, coupled with no interest in the land, ordinarily is extinguished by the destruction of the structure."  Defendant argues that the nature of her easement distinguishes the instant case from *Bilodeau*, and, accordingly, makes the rule announced therein inapplicable.

Application of the rule announced in *Bilodeau* is of no help to Plaintiff because

here the wharf was not physically destroyed.  As the parties have stipulated, part of the wharf, the granite cribs, were retained and remain part of the existing wharf.  Joint exhibit A ¶ 10.  Because part of the wharf[8] remained intact at all times, there remained "a servient tenement in existence upon which the right [could] operate" and the easement was not extinguished.  *Id*.

Furthermore, it would be inappropriate to extend the rule to cases involving only partial destruction of the structure.  A rule permitting the owner of a servient structure to extinguish an easement by partially destroying the structure, would provide an unacceptable risk of abuse.  Thus, the rule stated in *Bilodeau* is better applied when the servient owner destroys the *entire* structure.  *See* 4 Powell on Real Property § 34.19.  In order to extinguish the easement, the owner of the servient structure must not only render the structure unusable for the dominant tenement, but also for the servient tenement. Thus, the two estates suffer the same loss.  Extension of that rule to situations such as the one presented here, where the owner of the servient estate only partially destroyed the structure and used what remained to construct an almost identical structure, would undercut the rule's inherent protection against arbitrary abuse.

Moreover, even if Plaintiff had completely destroyed the wharf it is unlikely that, on the facts of this case, that would have extinguished the easement.  As Defendant correctly argues, the facts of this case distinguish it further from *Bilodeau*.  In that case, the plaintiff, the Town of Sabbatus, enjoyed an easement in gross for use of a dam located on the defendant's property.  *Bilodeau*, 391 A.2d at 359.  The dam had, at the

---

[8] Although the record is unclear as to how much it would have cost for Plaintiff to replace the granite cribs, the Court finds that it was not insubstantial.  The parties have valued the right to use the wharf at $250,000, yet Plaintiff alleges that the cost to build the entire wharf, excluding the granite cribs, was slightly less than $31,000.  While this does not present conclusive proof of the value of the granite cribs, the Court finds it persuasive proof that their value is not insubstantial.

time of creation of the easement, been needed to impound water for the Town's fire protection system.  *Id*. at 358.  In the years following creation of the easement, however, a new fire protection system had become operative and rendered the old system obsolete. *Id*. at 359.  During this time the defendant's property had become both hazardous and an economic liability.  *Id*.  The defendant sought to demolish a mill located on his property in order to make the land marketable.  *Id*.  Destroying the mill, however, would have dangerously weakened the dam.  *Id*.  When the defendant sought to destroy the dam, the Town brought suit to enjoin him from doing so.  *Id*.  In permitting the defendant to destroy the dam, the Law Court held that an owner of an obsolete structure, encumbered by an easement in gross, which has also become an economic liability, enjoys the right to destroy the structure and eliminate the easement.  *Id*. at 360.

The facts in *Bilodeau* differ from this case in three important ways.  First, the easement in this case is one appurtenant, not in gross.  As the Law Court noted, "While an intentional termination of an easement which is appurtenant to land of another may, under given circumstances, be enjoined, the same rule does not necessarily apply to easements in gross."  *Id*. at 360.  Generally, easements appurtenant provide a greater property interest, including the right of alienation, which is not usually enjoyed with easements in gross.  *See Wentworth v. Sebra*, 2003 ME 97, ¶ 13, 829 A.2d 520, 524 ("An easement in gross is generally not assignable and terminates upon the death of the grantee.")  Consequently, it may be appropriate to further constrain the servient estate's ability to extinguish an easement appurtenant.

Another distinction to be drawn between these two cases is that the structure here was not rendered obsolete by subsequent events.  Defendant had not obtained the rights

to use another wharf or built a wharf herself.  Accordingly, the purpose underlying the easement still remained in effect, and the easement still had value to Defendant.

Lastly, there is no evidence that the wharf created an economic liability for Plaintiff.  Plaintiff has not asserted that his property value was diminished by maintaining the wharf on his property.  To the contrary, the evidence demonstrates that Plaintiff made extensive use of the wharf, and refurbished the wharf for the express purpose of continuing that use.

In this Court's view, *Bilodeau* may be fairly read to determine the terminability of an easement in gross by balancing the substantial interest of the servient estate to dispose of an economic liability, against the dominant estate's lack of interest to maintain it.  On the facts of this case, where the easement was not obsolete and not an economic liability, such a balance strongly favors a determination that the easement appurtenant was not terminable upon the willful destruction of the structure by Plaintiff.

### B.  Breach of Contract

In Count III of his Complaint Plaintiff alleges that Defendant is liable for failing to contribute towards maintenance of the wharf.  Specifically, Plaintiff seeks an award of $29,183, representing one-half of the costs he alleges to have incurred refurbishing the wharf, and maintaining it on a yearly basis.[9]  Defendant does not dispute that, if she uses the wharf, the deed imposes on her an enforceable duty to contribute a "proportionate share of the cost of maintenance" of the wharf.

Defendant contends that her duty to contribute a "proportionate share" does not

---

[9] Specifically, Plaintiff claims to have expended $25,566 for construction costs incurred refurbishing the wharf; $4,400 for costs incurred designing the wharf refurbishment; $1,000 incurred applying a preservative coating on the wharf; $5,900 for labor performed by Plaintiff and his son on the wharf; $1,400 for materials used to repair the wharf; and $20,100 for costs associated with annually installing and removing the ramp and float.

obligate her to contribute one-half of the costs, but rather, a share based upon her proportionate use of the wharf.  Defendant also challenges Plaintiff's calculation of damages, asserting that "maintenance" of the wharf does not include the costs incurred refurbishing the wharf in 1995, and arguing that Plaintiff has failed to offer adequate proof of other claimed expenses.  Additionally, Defendant maintains that, in any event, laches and equitable estoppel bar Plaintiff from recovery of any costs associated with maintenance of the wharf.

### 1.  Laches and Equitable Estoppel

Turning first to Defendant's equitable arguments, the Court concludes that Plaintiff is not barred from recovering on his claim.  Defendant claims that Plaintiff failed to adequately demand contribution for maintenance until this suit, and that, as a result, Plaintiff is barred by both laches and equitable estoppel from recovering those sums now.  Putting aside the question of whether Plaintiff appropriately sought contribution prior to this suit, under both defenses Defendant bears the burden of proving prejudice.  Defendant, however, has failed to offer any credible evidence that Plaintiff's allegedly belated request for contribution has prejudiced her.  The only prejudice even alleged by Defendant is that "the ability to remember and determine 'proportionate share' has faded into history."  Jean Yarnall's Post-Trial Brief at 18.  Contrary to Defendant's assertion, she presented a substantial amount of evidence concerning her and her family's use of the wharf over the relevant period.  Furthermore, any proof problems arising from the delay would seemingly benefit Defendant, as Plaintiff bears the burden of proving his antiquated claim.  Finally, there is nothing in the record that indicates that Defendant could have better opposed the claim had it been made earlier.  Accordingly, Defendant

has failed to establish either defense, and Plaintiff is not barred from recovery.

### 2.  Interpreting "Maintenance"

Defendant's claim that "maintenance" does not include the costs incurred refurbishing the wharf is also without merit.  As Defendant concedes, the term maintenance "expresses an obligation to share in the costs of keeping the [wharf] in its existing state of repair."  Jean Yarnall's Post-Trial Brief at 6.  When the easement was created, in 1982, the wharf, while by no means brand new, was in a sufficient state of repair so as to permit it to be safely used.  At trial, Plaintiff proved by a preponderance of the evidence that by 1995 the wharf was in such a state of decay that it needed substantial reconstruction in order to continue to safely serve its function.  *See* Deposition of Dan Chalmers, Exhibit 28 at 8 ("[the wharf] was old, the material was rotten, the attached hardware to connect [the] ramp to [the] pier was all disintegrating, coming apart.").  Although there is some evidence that the refurbished wharf was not completely identical to the wharf as it existed in 1982, Defendant has offered no evidence that the minor changes resulted in costs additional to those required to restore it to comparable, usable condition.  Based upon the evidence presented, the Court is persuaded that the refurbishment of the wharf in 1995 was necessary to maintain the wharf's continued use.  Accordingly, the Court concludes that "maintenance" includes those costs which were reasonably incurred in refurbishing the wharf.

### 3.  Proven Costs

While Plaintiff may recover for the costs of maintaining the wharf, he bears the burden of proving what those costs were and that they were reasonable.  Plaintiff claims three categories of costs; the Court will address each separately.

**a.**

Plaintiff claims to have expended $30,966 in refurbishing the wharf. This consists of $25,566 for the actual construction of the wharf, $4,400 for design of the wharf, and $1,000 for the application of a preservative coating to guard against wear. The record contains ample evidence supporting Plaintiff's claim that he expended $25,566 for construction on the wharf. The evidence also establishes that this cost was reasonably necessary to maintain the continued and future functionality of the wharf.

As for the design costs, the only evidence in the record regarding this cost was from Plaintiff's own testimony. Although Plaintiff entered into evidence the deposition of Robert Burley, the architect who did the design work, Mr. Burley was unable to provide any information concerning how much he charged for his services. Even if Plaintiff's testimony accurately discloses the cost of Mr. Burley's services, the Court is unable to conclude whether those costs were reasonably incurred. Mr. Burley testified that Plaintiff did the majority of the work in obtaining bids, and that Mr. Burley's function was primarily to review the bids and provide advice to Plaintiff. There is no evidence as to how much time Mr. Burley spent doing this work, or how much he charged for his services. Mr. Burley also provided additional work unrelated to "maintaining" the wharf, sketching a proposed "pavilion" to include in the structure. Plaintiff testified simply that he paid Mr. Burley $4,400. He did not explain what part of that amount, if any, was actually attributable to work Mr. Burley did that was necessary to restore the wharf to its prior, usable condition.

Based upon this record, Plaintiff has failed to prove by a preponderance of the evidence that any architectural costs were reasonably incurred in "maintaining" the

wharf.  Similarly, with respect to the protective coating, the only evidence of this cost comes from Plaintiff's own testimony, and there is no testimony as to why this work was reasonably necessary.  Accordingly, Plaintiff has failed to prove this element of his damages.

**b.**

Next, Plaintiff claims to have expended $7,300 in costs relating to the yearly maintenance work performed by he and his son.  This sum includes the value of their respective labor, valued by Plaintiff at $12 per hour, and the cost of materials.  Although Plaintiff may recover for the value of his own labor, there is no evidence in the record that Plaintiff paid his son for his services or is indebted to do so.  Consequently, Plaintiff has not established that the value of his son's work is a "cost" to which Defendant must contribute.  Although Plaintiff did not maintain contemporaneous records of the work he performed on the wharf and the materials he utilized, the Court finds his testimony on the matter credible, and concludes that he has proven his claim for costs of $240 each year in labor, and $100[10] each year in materials.

**c.**

Lastly, Plaintiff claims $20,100 in costs associated with annually installing and removing the ramp and float.  As Defendant correctly points out, part of the costs sought by Plaintiff are financing charges incurred due to late payments, and, accordingly, are not recoverable as costs of maintenance.  The properly recoverable costs from 1998 through 2004 total $10,087.70.  Defendant also asserts that Plaintiff has failed to offer sufficient evidence for costs incurred prior to 1998.  Although it is true that Plaintiff has failed to

---

[10] Although at trial Plaintiff testified that he expended $120 to $140 per year on materials, in his Post-Trial Brief Plaintiff places these costs at $100 per year.  The Court will accept Plaintiff's most recent assertion.

offer any billing statements or other documentary evidence in support of this claim, the Court finds the testimony presented on the matter to be credible.  Consequently, the Court concludes that Plaintiff incurred annual costs in the amount of $500 from 1982 through 1991, and $700 from 1992 through 1997.

### 4.  Interpreting "Proportionate Share"

Having determined the costs proven to be associated with maintenance of the wharf, the Court must determine to what extent Defendant was obligated to contribute. This requires the Court to interpret the term "proportionate share."  Plaintiff contends that "proportionate share" must be interpreted to require Defendant to contribute one-half of the costs.  Defendant insists that proportionate share should be determined based upon the parties' proportionate *usage* of the wharf.  For the reasons stated below, the Court agrees with Defendant's construction of the covenant.

The parties agree that the term "proportionate share" lacks a vital qualifier, namely, the things being compared or "proportioned."  Plaintiff resolves this ambiguity in two steps.  First, he argues that the Court should apply the rule of deed construction providing that "where the language in a deed, … used to make an exception or reservation, is doubtful, it is to be construed most strictly against the grantor and most favorably for the grantee."  *See Billings v. Beggs*, 114 Me. 67, 68, 95 A. 354, 355 (1915). This rule of construction, however, is of doubtful applicability here, as the Court is not called upon to construe the language that reserved the easement.  Here, the Court is construing the terms of a covenant, and Plaintiff has cited to no authority supporting application of the rule of construction to the present circumstance.  Furthermore, even if the rule were applicable in this instance, it is only one tool to be used in construing the

covenant.

Plaintiff's other argument is, essentially, that his interpretation is easier to apply. He asserts that it would be difficult, if not impossible, to determine, with any measure of precision, the Defendant's share of costs if that share is determined by relative use of the parties. Thus, Plaintiff argues, the Court should construe the phrase to require Defendant to contribute based upon an easily measured factor, specifically, "the number of parties using the wharf."

While there is some appeal to the simplicity provided by Plaintiff's construction, there is no reason to believe that the parties creating the covenant *intended* to create such a basis for comparison. As Defendant argues, had they intended to divide the costs based upon a readily identifiable comparison, the parties could have easily indicated their intention to do so. In the Court's judgment, the retention of the ambiguity evinces a tacit acknowledgement by the contracting parties that the dominant estate's "proportionate share" is not so easily determinable.

Nor is the practical difficulty of determining the parties proportionate use a significant obstacle. In at least some jurisdictions, the general rule is that, absent agreement otherwise, the obligation to maintain an easement is "distributed between the dominant and servient tenements in proportion to their relative use of the [easement], as nearly as such may be ascertained." *Barnard v. Gaumer*, 146 Colo. 409, 413-14 (Colo. 1961); *see also Lakeland Property Owners Asso. v. Larson*, 121 Ill. App. 3d 805, 811 (Ill. App. Ct. 1984), *Lindhorst v. Wright*, 616 P.2d 450, 454-55 (Okla. Ct. App. 1980); *Bina v. Bina*, 213 Iowa 432, 438 (Iowa 1931). Accordingly, the Court concludes that Defendant was obligated to contribute to the costs of maintenance of the wharf based upon

Defendant's proportionate use of the wharf.

Having heard extensive evidence from both parties concerning their relative use of the wharf, the Court concludes that use attributable to Defendant equaled one-fifth of the total use from 1983 through 1988 and one-fifth from 1991 through 2004. The Court concludes that Defendant is not liable for any maintenance costs incurred in 1982 as she did not become an owner of the property until after the summer season of 1982.[11] Similarly, Defendant is not liable for costs incurred during 1989 and 1990, as she was not owner of the Barnacles during those summer seasons, and there is no evidence of any use of the wharf during that time which is attributable to her.[12] Thus, Plaintiff's total costs associated with maintaining the wharf are as follow:

| | |
|---|---|
| Refurbishing Wharf | $25,566 |
| Yearly Maintenance Work Performed by Plaintiff ($340 per year 1983-1988, 1991-1994) | $3,400 |
| Yearly Professional Maintenance ($3,000 for 1983-1988 ($500 per year); $500 for 1991; $4,200 for 1992-1997 ($700 per year); and $10,087.70 for 1998-2004) | $17,787.70 |
| Total Costs Incurred Maintaining the Wharf | $46,753.70 |
| Defendant's Proportionate (one-fifth) Share | $9,350.74 |

Accordingly, the Court concludes that Plaintiff is entitled to recoverable damages in the

---

[11] Generally, a successor in title is not liable for past breaches of a covenant running with the land. *See MCI Telecomms. Corp. v. Tri-County Metro. Transp. Dist.*, 1999 U.S. App. Lexis 29239 (9th Cir. 1999); *Vinson v. Meridian Masonic Temple Bldg. Asso.*, 475 So.2d 807, 809 (Miss. 1985). Thus, to the extent that Mr. Yarnall breached the covenant by failing to contribute for the wharf usage during the summer of 1982, Plaintiff has failed to demonstrate that Defendant is liable for that prior breach.

[12] During this time Defendant was a mortgagee of the property, and, thus, retained title in some respect. There is no evidence, however, that the mortgagors ever made use of the wharf during this time, and, thus, the Court need not determine whether Defendant would be liable for any breach occurring during this period.

amount of $9,350.74.

### III. CONCLUSION

Accordingly, the Court **ORDERS** that judgment be entered for Defendant on Counts I and II of the Amended Complaint.  The Court further **ORDERS** that judgment be entered in favor of Plaintiff on Count III of the Amended Complaint in the amount of Nine Thousand Three Hundred Fifty Dollars and Seventy-Four Cents ($9,350.74).


/s/ Gene Carter_____
GENE CARTER
Senior United States District Judge


Dated this 11th day of July, 2006.

21